MOSK, J.—
I concur in the opinion of the court.
I write separately because, on one point, I wish to say somewhat more.
I
I agree with the court in the substance of its analysis, which involves its reading of section 31 of article I of the California Constitution (section 31) and its application to the City of San Jose’s “Nondiscrimination/Nonpreferential Treatment Program” applicable to public contracts for construction projects in excess of $50,000.
A
By initiative measure denominated as Proposition 209 on the ballot at the November 5, 1996, General Election, and approved by the voters thereat, section 31 was added to article I of the California Constitution.
Section 31 provides that “[t]he State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.” (Cal. Const., art. I, § 31, subd. (a).) It defines the “State” to “include, but not necessarily be limited to, the State itself, any city, county, city and county, public university system, including the University of California, community college district, school district, special district, or any other political subdivision or governmental instrumentality of or within the State.” (Id., art. I, § 31, subd. (f).)
Stated negatively, section 31 prohibits governmental actors from improperly burdening or benefiting any individual or group in the operation of public employment, public education, or public contracting. The prohibition is not limited to barring such actors from improperly assigning burdens or benefits themselves. Rather, it extends to barring them from enabling, facilitating, encouraging, or requiring private parties to do so as well. For the operation of each of the indicated activities involves private parties as well as governmental actors—in other words, the operation of each entails the cooperation of both. One of section 31’s purposes is to preclude any invidious barrier or privileged entrance to participation.
*571 Stated positively, section 31 commands governmental actors to treat all individuals and groups equally in the operation of public employment, public education, and public contracting. The command is not limited to compelling governmental actors to afford equal treatment themselves. Rather, it extends to compelling governmental actors to enable, facilitate, encourage, and require private parties to do so as well. Again, the operation of each of the indicated activities involves private parties as well as governmental actors, the operation of each entailing the cooperation of both. One of section 31’s purposes is to remove all invidious barriers and privileged entrances to participation.
Neither section 31’s prohibition against the improper assigning of any burden or benefit in the operation of public employment, public education, or public contracting, nor its command of equal treatment therein, is limited solely to ends. Rather, both extend to means as well. Thus, one may not assign any burden or benefit improperly in an attempt to assign some other burden or benefit properly. Similarly, one may not afford treatment that in any respect is unequal in an attempt to afford treatment that in some other respect is equal. For section 31 at least, the end does not justify the means. Rather, means and end must each justify itself in light of section 31’s prohibition and command.
B
On October 21, 1997, through its city council, the City of San Jose adopted its “Nondiscrimination/Nonpreferential Treatment Program” applicable to public contracts for construction projects in excess of $50,000. It did so in response to “evidence that discriminatory practices existed in construction subcontracting” for public works on the part of prime contractors and evidently the city itself with regard to subcontracting firms that are owned by women or members of minority groups. It sought to remedy the effects of past discrimination and preferential treatment, and to prevent present or future discrimination or preferential treatment, in the operation of public subcontracting.
The city’s program requires a prime contractor bidding on a covered public works contract, among other things, “to demonstrate nondiscrimination/nonpreferential treatment. . . in the hiring of subcontractors” before he can become eligible to be awarded the contract in question.
Specifically, the city’s program requires the prime contractor to make a demonstration of nondiscrimination/nonpreferential treatment by providing, as he may choose, either “documentation of outreach” or “documentation of participation.”
*572 Under the documentation-of-outreach component, which is relatively more burdensome, the prime contractor must “provide[] written notice . . . of his . . . interest in bidding on the contract” in question “to not less than four” subcontracting firms that are owned by women or members of minority groups “in each appropriate trade or area of work or supply ... at least 10 calendar days prior to the opening of bids”; must “follow!] up” such “written notices by contacting” each such firm “to determine with certainty whether” it is “interested in proposing to perform specific items of the project,” “documenting] the name of an individual employee of each . . . firm with whom” he “spoke concerning the project or the date and time of at least three . . . attempts during regular business hours to contact each . . . firm”; and must “negotiate[] in good faith with” each such firm and “not unjustifiably reject” any ensuing bid “as unsatisfactory.” (Underscoring omitted.)
By contrast, under the documentation-of-participation component, which is relatively less burdensome, the prime contractor must “document[] the participation of’ subcontracting firms that are owned by women or members of minority groups meeting the “percentage of’ such firms that the city has “establishe[d], as an evidentiary presumption,” as the “percentage . . . that would be expected to be included . . . in the absence of discrimination” or preferential treatment.
After review, it becomes evident that, in both its documentation-of-outreach and its documentation-of-participation components, the city’s program violates section 31.
To be sure, the end that the city’s program seeks is altogether legitimate and even necessary under section 31.
The purpose of the city’s program accords with, and is indeed compelled by, the purpose of section 31. As stated, the program’s object is to remedy the effects of past discrimination and preferential treatment, and to prevent present or future discrimination or preferential treatment, in the operation of public subcontracting. As also stated, section 31’s object is to remove and preclude any and all invidious barriers and privileged entrances to participation in the operation of activities including public contracting.
Nevertheless, despite the legitimacy and even necessity of its end, the means that the city’s program employs offend section 31.
The documentation-of-outreach component of the city’s program, with which a prime contractor who so chooses must comply in order to establish *573 eligibility, requires the prime contractor to grant preferential treatment to subcontracting firms that are owned by women or members of minority groups. As explained, it requires him to provide written notice of his interest in bidding on the contract in question to no fewer than four subcontracting firms that are owned by women or members of minority groups in each pertinent trade or area of work or supply at least 10 calendar days prior to the opening of bids, to follow up such written notice with documentation of his efforts, and to negotiate in good faith and not unjustifiably reject as unsatisfactory any bid that may be forthcoming. It does not require him to take any of these steps otherwise. It thereby skews the process in favor of subcontracting firms that are owned by women or members of minority groups. Not only does it invite those firms into the process, it also guarantees that they will be dealt with well during its course, and will not be ushered out without reason at its end. It does not do the same for others.
The documentation-of-participation component of the city’s program, with which a prime contractor who so chooses must comply in order to establish eligibility, at least encourages the prime contractor to grant preferential treatment to subcontracting firms that are owned by women or members of minority groups. As explained, it requires him to meet the “evidentiary presumption” that the city has established as the percentage of such firms that would be expected to be included in the absence of discrimination or preferential treatment. It at least encourages him to select such firms in such percentage when all other things are equal—and even when they are not—in order to avoid the need to comply with the more burdensome documentation-of-outreach component. It thereby skews the outcome in favor of subcontracting firms that are owned by women or members of minority groups. Inclusion of those firms can help the prime contractor obtain award of the contract in question. Inclusion of others cannot.
In sum, the means that the city’s program employs through its documentation-of-outreach and documentation-of-participation components offend section 31 because they either require or at least encourage a prime contractor to grant preferential treatment to subcontracting firms that are owned by women or members of minority groups.
II
Although I agree with the court in the substance of its analysis, on a single point I would go farther than it does.
In a strict sense, it is sufficient to read section 31 soundly and apply it to the city’s program correctly.
*574 But, as a practical matter, to do so is hardly enough. It gives scant guidance to the city itself or to other governmental actors. Some such guidance seems appropriate and even needed. Passivity is not demanded by section 31. Nor can it even be tolerated. Not only does section 31 prohibit governmental actors from improperly burdening or benefiting any individual or group in the operation of activities including public contracting, in order to preclude any invidious barrier or privileged entrance to participation. But it also commands such actors to treat all individuals and groups equally, in order to remove all such barriers and entrances.
By way of guidance, we may perhaps use the city’s program as a template for a measure that would satisfy section 31 in both its end and its means by retaining only its documentation-of-outreach component, and by modifying that component as follows.
A prime contractor would have to provide written notice of his interest in bidding on the contract in question to no fewer than, say, 10 subcontracting firms of his own choosing in each pertinent trade or area of work or supply at least 10 calendar days prior to the opening of bids, noting the identity of the owner or owners of each such firm—all to be reflected on a form to be filed as a public record. He would have to follow up such written notice with documentation of his efforts—again, all to be reflected on a form to be filed as a public record. And he would have to negotiate in good faith and not unjustifiably accept as satisfactory, or reject as unsatisfactory, any bid that may be forthcoming, stating his reasons for accepting or rejecting each—yet again, all to be reflected on a form to be filed as a public record.
Such a documentation-of-outreach component would be consistent with section 31’s prohibition that governmental actors must not themselves improperly burden or benefit any individual or group in the operation of activities including public contracting, or enable, facilitate, encourage, or require private parties to do so. It would also be consistent with section 31’s command that such actors must themselves treat all individuals and groups equally, and enable, facilitate, encourage, and require such parties to do so.
A documentation-of-outreach component like the above might prove to be an effective mechanism for prophylaxis. It would cause the prime contractor, one would hope, to rationalize his subcontracting conduct and thereby afford the commanded equal treatment and avoid the prohibited improper benefiting or burdening.
Furthermore, a documentation-of-outreach component like the above might prove to be an effective mechanism for monitoring. It would cause the *575 prime contractor to make a public record of his subcontracting conduct and thereby provide evidence of compliance or noncompliance, as the case may be.
It is true that such a documentation-of-outreach component would require the prime contractor to note the identity of the owner or owners of each subcontracting firm to which he chooses to provide written notice. But it would hardly require him to improperly benefit any such firm or burden any other or to afford treatment that is at all unequal—or even encourage, facilitate, or enable him to do so. For it would work solely as a prophylactic and monitoring device, furthering the component’s prophylactic and monitoring function.
III
In conclusion, concurring as I do in the opinion of the court, I concur in its judgment affirming the judgment of the Court of Appeal.